IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHAEL LEWIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10-CV-3163 |
| | ) | |
| LARRY PHILLIPS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge.

Plaintiffs, proceeding pro se, are detained in the Rushville Treatment and Detention Center pursuant to the Illinois Sexually Violent Persons Act.  They pursue First Amendment claims arising from restrictions on their access to movies, video games, video gaming systems and other electronic devices.  A retaliation claim is also pursued based on Plaintiffs' allegations that these restrictions were put in place in order to retaliate against them for lawsuits.

Before the Court are the parties' motions for summary judgment.  At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  Id.

In short, the Court concludes that the restrictions on movies and video games are constitutional.  Defendants' evidence demonstrates that the restrictions are reasonably related to legitimate safety, therapeutic, and staffing concerns.

As for the restrictions on video gaming systems and other electronic devices, Plaintiffs' request for more time to conduct discovery on this claim will be granted.  The Court had ordered Defendants to supplement their motion regarding this claim, and Plaintiffs should be given a chance to obtain evidence to oppose the supplemental information provided.

**ANALYSIS**

Plaintiffs are detained in the Rushville Treatment and Detention Center pursuant to the Illinois Sexually Violent Persons Act, 725 ILCS 207/1, et seq.  The Act defines a sexually violent person as a person found to be "convicted of a sexually violent offense, . . .and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the

person will engage in acts of sexual violence."  725 ILCS 207/5(f).

Once adjudicated as a sexually violent person, that person's

detention is indefinite until a conditional release or discharge is

granted.  725 ILCS 207/60; 725 ILCS 207/65.

Plaintiffs' access to movies and video games is restricted,

restrictions which have evolved since the inception of this lawsuit.

The first policy was a de facto ban on all movies rated R and NC-17

movies, M-rated video games and unrated movies and video games.[1]

The detainees could watch movies rated G, PG, PG-13, and could

play video games rated E, E10+, or T.  The policy was then revised

to allow detainees to watch R-rated movies and MA-rated video

games, except for those on a prohibited list compiled by therapists.

This policy was later further revised to ban unrated movies, rented

movies with a rating higher than PG-13, and original movies from

pay movie channels such as Showtime, HBO, Starz, and Cinemax.

---

[1] According to the website for the Motion Picture Association, an R rating requires anyone under age 17 to be accompanied by a parent or guardian.  An R rating is described as "[c]ontains some adult material.  Parents are urged to learn more about the film before taking their young children with them." An NC-17 rating means that no one under 17 is admitted: "clearly adult."  www.mpaa.org/film ratings (last visited on March 28, 2014).  According to the website for the Entertainment Software Rating Board, T stands for Teen, and is described as "content . . . generally suitable for ages 13 and up.  May contain violence, suggestive themes, crude humor, minimal blood, simulated gambling and/or infrequent use of strong language." M stands for mature, which is described as "intense violence, blood and gore, sexual content and/or strong language."  There is also an A rating for video games, which stands for adults only:  "content suitable only for adults ages 18 and up.  May include prolonged scenes of intense violence, graphic sexual content and/or gambling with real currency." www.esrb.org/ratings (last visited March 28, 2014).

Video games and movies are forms of expression protected by the First Amendment. *See* <u>Brown v. Entertainment Merchants Ass'n</u>, 131 S.Ct. 2729, 2733 (2011)("video games qualify for First Amendment protection"); <u>Young v. American Mini Theatres, Inc.</u>, 427 U.S. 50, 59 (1976)(recognizing that ordinance affecting adult movie theater affected First Amendment communication rights). Plaintiffs' receipt of that expression is also a First Amendment right. <u>Bd. of Educ., Island Trees Union Free School Dist. No. 26 v. Pico</u>, 457 U.S. 853, 867 ([T]he right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own" First Amendment rights)(emphasis in original). However, as with all First Amendment rights, Plaintiffs' First Amendment rights must be balanced against legitimate governmental concerns.

## I. The applicable legal standard to the restrictions on movies and video games is the <u>Turner</u> test: Are the restrictions reasonably related to legitimate government interests?

Individuals detained under the Illinois Sexually Violent Persons Act are treated like pretrial detainees for the purpose of analyzing constitutional claims. *See* <u>Brown v. Budz</u>, 398 F.3d 904 (7th Cir. 2005)(failure to protect claim by sexually violent person); <u>Sain v. Wood</u>, 512 F.3d 886, 893 (7th Cir. 2009)(conditions of

confinement claim by sexually violent person).  Like pretrial detainees, the conditions of confinement for sexually violent detainees cannot amount to punishment.  Lane v. Williams, 689 F.3d 897 (7th Cir. 2012)("Commitment under the Act is civil and so may be for purposes such as incapacitation and treatment, but not punishment.").

Plaintiffs argue that they are different than pretrial detainees because Plaintiffs' detention is generally much longer than the detention of the average pretrial detainee.  *See* Bell v. Wolfish, 441 U.S. 520 (1979)(noting that nearly all the detainees in that case were released within 60 days).  True, the detention of a person under the Illinois Sexually Violent Persons Act can be indefinite, and this Court has cases filed by sexually violent detainees who have been detained under the Act for more than a decade.  *See* Smego v. Aramark, 10-CV-3334 (C.D. Ill., 5/13/13 order, p. 4.)

However, while the length of the detention may be a relevant factor in determining whether a restriction or condition is constitutional, a legal test different from that applicable to pretrial detainees does not need to be created.

For example, in <u>Smego v. Aramark, et al.</u>, 10-CV-3334, this Court recently considered sexually violent detainees' lengthy detention within the framework of a pretrial detainee analysis. Plaintiffs in that case, all detained in the Rushville Treatment and Detention Center, essentially allege that the food is so bad that they cannot eat it. The pretrial detainee analysis was flexible enough in that case to address the fact that Plaintiffs' detention had continued long past the detention of most pretrial detainees. In other words, the Court rejects Plaintiffs' argument that the legal analysis for pretrial detainees does not apply to Plaintiffs' claims.

This Court has, in past cases dealing with First Amendment rights of detainees at the Rushville Treatment and Detention Center, applied <u>Turner v. Safely</u>, 482 U.S. 78, 89 (1987). *See, e.g.,* <u>Schloss v. Ashby</u>, 11-CV-3337 (C.D. Ill); <u>Lingle v. Ashby</u>, 13-3017 (C.D. Ill). <u>Turner</u> held that restrictions on a prisoner's First Amendment rights are constitutional if those restrictions are "reasonably related to legitimate penological interest[s]." 482 U.S. at 89. <u>Turner</u> addresses prisoners' rights to marry and to correspond with other inmates.

Turner identified the following factors relevant to determining whether a restriction is reasonably related to a legitimate government interest: 1) whether the restrictions are rationally connected to achieving the stated legitimate and neutral governmental interests; 2) whether the detainees have alternate ways to exercise their First Amendment rights; 3) whether and to what extent accommodating Plaintiffs would adversely impact staff and other detainees; and, 4) whether the restrictions are an "exaggerated response," for example if "ready alternatives" for achieving the same interests exist. Turner, 482 U.S. at 78-79; Beard v. Banks, 548 U.S. 521, 529 (2006); Shaw v. Murphy, 532 U.S. 223 (2001)("Turner provides the test for evaluating prisoners' First Amendment challenges, . . . ."). Restrictions that are reasonably related to legitimate government concerns are necessarily not considered punishment under the Due Process Clause. *See, e.g.,* Lingle v. Kibby, WL (7th Cir. 2013) (unpublished) ("[A] condition of confinement may be imposed on a pretrial detainee without violating the Due Process Clause if it is reasonably related to a legitimate *and non-punitive* governmental goal.'" (*quoting*

<u>Antonelli v. Sheahan</u>, 81 F.3d 1422, 1427-28 (7th Cir.

1996)(emphasis in <u>Lingle</u>)[2].

The Seventh Circuit has not, in any published precedent of

which the Court is aware, directly ruled on whether <u>Turner</u> applies

to a First Amendment challenge by a person detained pursuant to

the Illinois Sexually Violent Persons Act.  However, the Seventh

Circuit in <u>Lane v. Williams</u>, 689 F.3d 879, 884 (7th Cir. 2012), did

remark in dicta that "[b]ecause <u>Turner</u> tells courts to consider the

challenged regulation in relation to the government's legitimate

interests, it would not be too difficult to adapt its standard for

claims by civil detainees.  To do so, courts would only have to

recognize the different legitimate interests that governments have

with regard to prisoners as compared with civil detainees."  <u>Lane</u>

involved a First Amendment challenge regarding communication

between detainees at the Rushville Treatment and Detention

Facility.  The Seventh Circuit Court of Appeals did not have to

decide whether <u>Turner</u> applied because the plaintiffs in <u>Lane</u> had

---

[2] In <u>Lingle</u>, the Seventh Circuit reversed as premature this Court's dismissal for failure to state a claim of a challenge to the same video gaming ban at issue in this case.  The video gaming system and electronic device restrictions will be addressed in a separate order after Plaintiffs are given additional discovery.

failed to establish any infringement on their First Amendment rights. 689 F.3d at 884.

This Court agrees with <u>Lane</u>'s observation. The <u>Turner</u> factors are broad enough to readily adapt from the prison setting to the civil detainee setting. The Supreme Court and the Seventh Circuit have already applied <u>Turner</u>, or an analysis similar to <u>Turner</u>, to First Amendment challenges by pretrial detainees. *See, e.g.,* <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979)(limiting pretrial detainees' access to hardcover books was rationally related to security concerns; alternative means existed for pretrial detainees to obtain books); <u>Block v. Rutherford</u>, 468 U.S. 576 (1984)(restrictions on pretrial detainees' contact visits was reasonably related to legitimate governmental interest in security); <u>Ortiz v. Downey</u>, 561 F.3d 664, 669 (7th Cir. 2009)(applying <u>Turner</u> to religious practice challenge by federal pretrial detainee); <u>Antonelli v. Sheahan</u>, 81 F.3d 1422 (7th Cir. 1996)(remanding for determination whether pretrial detainee's restrictions on reading material were justified); <u>Jackson v. Elrod</u>, 881 F.2d 441 (1989)(analyzing pretrial detainee's First Amendment claim arising from hardcover book ban under <u>Wolfish</u>); <u>Martin v. Tyson</u>, 845 F.2d 1451 (7th Cir. 1988)(upholding inspection of

pretrial detainees' personal mail outside presence because practice served a legitimate purpose).

Some of these cases were decided before <u>Turner</u>, but the analysis was substantively identical:  Did the restrictions logically serve a legitimate government interest? This same test has already been applied to determine whether the treatment of a sexually violent detainee amounts to punishment under the Due Process Clause.  *See*, *e.g.*, <u>Allison v. Snyder</u>, 332 F.3d 1076, 1079 (7th Cir. 2003)(placing persons civilly detained under the Illinois Sexually Dangerous Persons Act in prisons subject to prison rules is not "punitive" if the restrictions advance legitimate goals such as security, safety, and rehabilitation).

Plaintiffs argue that a "more considerate" standard than <u>Turner</u> should apply to them, citing <u>Youngberg v. Romeo</u>, 457 U.S. 307, 322 (1982).  <u>Youngberg</u> involved a mentally challenged individual who had been involuntarily committed to the State's care.  The Supreme Court in <u>Youngberg</u> recognized that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  457 U.S.

at 322.  While Plaintiffs are not mentally challenged, <u>Youngberg</u>
applies to them as involuntarily committed civil detainees.  <u>Lane</u>,
689 F.3d at 881.  "Commitment under the [Sexually Violent Persons
Commitment] Act is civil and so may be for purposes such as
incapacitation and treatment, but not punishment."  <u>Id.</u>

Plaintiffs are incorrect that <u>Youngberg</u> gives them more First
Amendment rights than <u>Turner</u>.  Whether or not <u>Youngberg</u> applies,
the question is still whether the restrictions on Plaintiffs' First
Amendment rights are reasonably related to a legitimate
government interest.  <u>Youngberg</u> is relevant to that analysis to the
extent the restrictions reflect a mental health treatment decision.

In <u>Lane v. Williams</u>, 689 F.3d 879 (7th Cir. 2012), the detainees
at the Rushville Treatment and Detention Center challenged
restrictions on the ability of detainees living on different units to
interact.  The facility had justified the restriction on security
grounds; the therapists had taken no part in crafting the
restrictions.  The detainees argued that the restrictions affected
their mental health, and, therefore, the restrictions could not be
implemented without the exercise of professional judgment by the
therapists.  The Seventh Circuit rejected that argument, holding

that <u>Youngberg</u>'s professional judgment rule applied only to treatment decisions, and that the decision to keep the units separate had been a security decision.

Unlike <u>Lane</u>, in this case <u>Youngberg</u> is relevant because the restrictions in this case are justified on therapeutic grounds as well as on security grounds.  <u>Youngberg</u> requires the therapists to exercise their judgment within professionally acceptable bounds when crafting the restrictions on movies and video games. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  <u>Youngberg</u>, 457 U.S. at 323; <u>Kansas v. Hendricks</u>, 521 U.S. 346 n.4 (1997)(We have explained that the States enjoy wide latitude in developing treatment regimes [for civilly committed persons].")(*citing* <u>Youngberg</u>).

 To the extent the restrictions on movies and video games reflect treatment decisions by clinical professionals, the Court must keep <u>Youngberg</u>'s deference in mind in determining whether the restrictions are reasonably related to legitimate treatment goals and

the therapeutic impact on other detainees that might result from removing the restrictions.  A similar deference is afforded the non-clinical administrators' decisions made based on security, safety, and logistical concerns.  *See* Beard v. Banks, 548 U.S. 521, 528 (2006)("[C]ourts owe 'substantial deference to the professional judgment of prison administrators.'")

**II.  The restrictions on movies and video games were and are rationally related to legitimate safety, therapeutic, and staffing concerns.**

The first step in applying the Turner standard is to identify the legitimate government interests at stake.  Safety and security are legitimate government interests in this setting.  Thielman v. Leean, 282 F.3d 478, 483 (7th Cir. 2002)("facilities dealing with those who have been involuntarily committed for sexual disorders are 'volatile' environments whose day-to-day operations cannot be managed from on high.").  Treating the detainees' mental disorders and maintaining a therapeutic environment for all detainees are also legitimate government interests.  Detainees at the facility are constitutionally entitled to treatment for their mental disorder.  Lane, 689 F.3d at 882; Washington v. Harper, 494 U.S. 210, 225-26 (1990)("Where an inmate's mental disability is the root cause of the

threat he poses to the inmate population, the State's interest in
decreasing the danger to others necessarily encompasses an
interest in providing him with medical treatment for his illness.")

Another legitimate governmental interest advanced by
Defendants is the efficient allocation of resources and staff.
Defendants' decision that therapists' time is better spent providing
treatment than watching movies and playing video games is a
decision on how to best allocate limited staff resources.  *See* <u>Beard
v. Banks</u>, 548 U.S. 521, 529 (2006)("impact" factor of <u>Turner</u>
analysis includes impact on the ""allocation of prison resources
generally'")(*citing* <u>Turner</u>).

Having identified the legitimate government interests at stake,
the next step is to determine whether the restrictions are rationally
connected to achieving those interests.  To that end, Defendants
offer the affidavits of Defendant Shan Jumper, the clinical director
at the Rushville Treatment and Detention Center, and Greg Scott,
the current Director of the facility.

In a similar case challenging the movie and video game
restrictions at the Rushville Treatment and Detention Center,
<u>Smego v. Payne</u>, 09-3244 (C.D. Ill.), Judge Harold A. Baker

concluded in that case that the ban on R-rated movies and M-rated

video games was constitutional:

> the decision to limit access based on ratings was
> reasonably related to the facility's interest in
> rehabilitation and in limiting the financial and time
> burden in processing media requests.  An individual
> approach, like the plaintiffs seek, was not a ready
> alternative.  The policy may have case a wide net, but
> that does not make it unconstitutional.  The fact that the
> policy has since changed to allow R movies and games
> except for those on a prohibited list, does not make the
> prior policy unconstitutional.  The court's deference to
> the administrators running the facility is broad enough to
> encompass both approaches.

Id., 6/9/11 order.  The Smego case was transferred to this Court in

September 2011, and this Court agreed with Judge Baker's

conclusions. (8/21/12 order.)  However, this Court granted a

motion to reconsider filed by three of the plaintiffs in the Smego

case because the plaintiffs had argued that they had not had a

sufficient opportunity to engage in discovery on the claim.  Id.

Discovery was reopened, but then, the case was dismissed on

January 17, 2014, pursuant to the parties' stipulation.  Arguably,

then, this Court did not conclusively rule in the Smego case

whether the restrictions on movies and video games were

constitutional because the case was ultimately dismissed by stipulation.

In sum, the Court concludes, for the same reasons that Judge Baker found the movie and video game restrictions constitutional in Smego v. Payne, that the movie and video game restrictions at issue in this case are constitutional.

Plaintiffs are correct that Judge Baker's opinion does not bind this Court, but his reasoning is persuasive. As already noted, federal courts must afford "substantial deference" to those in charge of running the Rushville facility and treating the detainees' mental disorders. *See* Beard v. Banks, 548 U.S. 521, 528 (2006)("[C]ourts owe 'substantial deference to the professional judgment of prison administrators.'"); Youngberg v. Romeo, 457 U.S. 307, 323 (1982)(decisions by professionals about mental health facility's operations afforded deference and violate the Constitution only if professional judgment not exercised). The affidavits from Jumper and Scott articulate legitimate security, safety, and therapeutic goals which the restrictions are logically designed to achieve.

Defendant Jumper submits the same affidavit in this case that he submitted in Judge Baker's Smego v. Payne case, along with a

supplementary affidavit addressing the changes in the policy over time.  According to Defendant Jumper, "access to media must not be considered only as to the individual requesting it, but how the request may affect the population of individuals who would come in contact and trade such media with other residents."  (Jumper Aff. para. 16.)  Greg Scott, the current Director of the facility, echoes this concern, averring that "prior incidents in this facility have repeatedly shown that where one resident has access to contraband or inappropriate materials, other residents will have access to the material almost immediately."  (Scott Aff. para. 10.)

The restrictions were put in place, according to Jumper, because of the "potentially harmful" content in "movies of higher ratings (R and MA) . . . [which] tend to include more violence, illegal activities, drug use, sexual deviance, sexual degradation, torture, stalking, non-consensual sex, sexual fantasies, and the like." (Jumper Aff. para. 18.)  Similarly, Jumper avers that "[v]ideo games such as Fear 2, Resident Evil, and Metal Gear appear on their faces to contain graphic violence which is not appropriate in a clinical setting."  Director Greg Scott avers that "[i]t would be contrary to the security goals of the facility to permit a resident to have

uncontrolled access to movies and video games of his preference containing graphic depictions of violence, sex, drug use, and criminal culture when he is being detained and treated in an effort to prevent and remediate the desire to engage in future criminal conduct." (Scott Aff. para. 12.) Defendants also contend that "the primary treatment goal facilitated by the media policy is the fostering of a therapeutic environment by limiting access to graphic depictions of violence, sex, drug use, and criminal culture."

Jumper acknowledges that some T-rated games and PG-13 rated movies also contain potentially harmful material, but he avers that the restrictions were a practical compromise which allowed some access to movies and games while attempting to limit at least some harmful material. The simplicity of the restriction made it easy to implement by the security staff and saved time for the therapists, who had been deluged with requests for exceptions. Jumper avers that he lacks the clinical staff necessary to conduct a more individual determination of each movie and game requested by detainees: "There is no one who is available to watch movies on demand (in light of the numerous requests) to identify all of the specific information and material that may or may not be harmful

to a particular individual or individuals at the Rushville TDF."
(Jumper Aff. paras. 19-20.)  Jumper avers that in order to make an
individualized assessment of the content of video games, the clinical
staff would have to play the game through all of its levels, and even
then would not know the game's entire content.  (Jumper Aff. para.
45.)  Similarly, Director Scott avers that the facility "lacks the
necessary resources . . . to implement individualized media policies
for individual detainees or groups of detainees.  (Scott Aff. para. 9.)

Jumper canvassed other states' approaches to this issue and
found a wide range of approaches, some more restrictive and some
less restrictive than the approach by the Rushville Treatment and
Detention Center.  (Jumper Aff. paras. 27-36.)  In Jumper's opinion,
"the policies and procedures at the Rushville TDF in Illinois are very
similar to those in other states and are consistent with the goal of
achieving a safe environment from a therapeutic and security
standpoint."  (Jumper Aff. para. 36.)

Plaintiffs argue that no evidence supports Jumper's
conclusion that higher rated movies and games contain more
objectionable material from a therapeutic-environment standpoint.
Plaintiffs assert that there is "no causative link between video

games and violence or video games and rape or sexual attitudes . . . ." (Pls.' Resp. para. 45.)  They challenge Defendants to point out any research proving a connection between the banned media and adverse therapeutic outcomes or security problems.  They assert that Defendant Jumper is not an expert and has not personally treated any of them.

Defendants do not need to cite research studies to support their conclusion that higher-rated media is likely to contain, in general, more anti-therapeutic content than lower-rated media. Turner held that restrictions on a prisoner's First Amendment rights are constitutional if those restrictions are "reasonably related to legitimate penological interest[s]."  482 U.S. at 89.  Defendants also do not need research studies proving that their approach will achieve a measurable improvement in the therapeutic environment. Articulating some rational connection is enough.  In Beard v. Banks, 548 U.S. 521 (2006), the Supreme Court upheld restrictions on newspaper and magazines to a certain prison population based on the prison superintendent's affidavit and deposition; no outside research studies were mentioned.  The prison superintendent there expressed in his affidavit his view that the restrictions served as

incentives to encourage good behavior. The Supreme Court held
that the superintendent's views were sufficient to demonstrate a
rational connection between the restrictions and the legitimate goal
of encouraging good behavior. 548 U.S. at 531-32.

Like <u>Beard</u>, the Defendants here offer a rational explanation
for their restrictions: unfettered access to all movies and video
games would cause substantial security, safety, and therapeutic
problems. Their conclusion is rational based on the nature of the
facility and the nature of the range of mental disorders from which
the detainees suffer.

The Court does not doubt, nor do Defendants dispute, that
many approved movies and games contain the same kind of
objectionable material as the prohibited media. That does not make
the restrictions irrational. <u>Mays v. Springborn</u>, 575 F.3d 643, 649
(7th Cir.2009)( it "takes no great leap to understand the prison's
reasons for wanting an article about a prison riot and images of
gang signs" barred even though the prisoner "had access to other
writings and to television shows about prison riots").

Defendants admit that the restrictions are a practical attempt
to accommodate the detainees while limiting potentially harmful

media in a way that is readily implemented.  Reviewing each movie and game is not possible given staffing limitations.  Relying on the ratings system is a bright-line, easy to enforce rule that logically strives towards achieving a more therapeutic environment for all detainees.  Efficient use of limited resources is also a legitimate government interest.  Lane v. Williams, 689 F.3d 879 (7th Cir. 2012)(Many policies and practices at a facility like Rushville reflect what the state can afford, what the site will allow, and what security requires; . . . .")

Plaintiffs offer no readily available alternative to the restrictions except to remove the restrictions entirely or to make an individualized assessment of whether certain games and movies are anti-therapeutic for a given detainee.  Plaintiffs assert that no problems existed before the restrictions were implemented, but they offer no competent evidence to support that conclusion.  In any event, Defendants are not required to maintain the status quo. Experimenting with changes designed to improve security and the therapeutic environment fall within the deference afforded to those running the facility.  Lastly, Plaintiffs have alternatives to exercising their First Amendment rights.  Many movies and video games are

still approved.  *See* <u>Singer v. Raemisch</u>, 593 F.3d 529, 539 (7th Cir. 2010)(banning of fantasy role playing games was rationally related to legitimate penological interests and prisoner had alternative means of exercising right, such as possessing other reading materials or playing allowable games).

The revisions to the original policy served to expand the movie and video game choices for detainees, and are supported by the same legitimate interests as the original ban.  Plaintiffs do not dispute that now they can possess many movies and games that they could not possess before the revision.  According to the record, the current policy allows detainees to view R-rated movies and play M-rated video games, except for those on a list developed by the therapists.  All movies must be rated by the Motion Picture Association of America, unless the movie was released before 1968, when the movie rating system was created.  Rented movies with a rating higher than PG-13 and any movies from pay channels such as "Showtime, HBO, Starz, Cinemax . . . ." are prohibited.  (Jumper Second Aff. para. 35; Scott Aff. para. 7.) Unrated video games or video games rated AO (ADULTS Only), Demo (demonstration purposes), or RP (Rating Pending) are also prohibited.  (Scott Aff.

para. 8.)  According to Dr. Jumper, the last three revisions were

implemented in response to some detainees' attempt to violate the

spirit of the policy by ordering unrated foreign movies and unrated

cable shows which contained "inappropriate graphic sexual

situations and/or violence."  (Jumper Second Aff. para. 31.)

In sum, all the versions of the restrictions on movies and video

games at issue here pass constitutional muster.  Other district

courts have reached the same conclusion involving similar

restrictions.  *See, e.g.,* Hedgespeth v. Bartow, 2010 WL 2990897

(W.D. Wis. 2010)(applying Turner and upholding restrictions on

access to electronics, CDs, DVDs, and video games by sexually

violent civilly committed persons); Marten v. Richards, 2010 WL

2650547 (W.D. Wash. 2010)("There is no clearly established

constitutional right to view R-rated materials [by persons civilly

committed as sexually violent predators](*citing* Jewell v. Gonzales,

420 F.Supp.2d 406, 438 (W.D. Pa. 2006)(upholding restriction on

inmates' access to unedited R-rated movies); Waterman v. Farmer,

183 F.3d 208 (3rd 1999)(upholding restriction on inmates' access to

"'sexually oriented and obscene materials'"); Hendrickson v. Nelson,

2006 WL 2334838 (E.D. Wis. 2006); Belton v. Singer, 2011 WL

2690595 *12 (D.N.J. 2011) (unpublished) (dismissing at pleading stage claim by sexually violent detainee challenging confiscation of gaming consoles and other electronics).

In any event, even if the Court were to conclude that the restrictions were or are unconstitutional, Defendants would be entitled to qualified immunity to the extent they are sued for damages. No party has pointed out, nor has the Court found, an analogous case holding similar restrictions unconstitutional. Plaintiffs' challenge, therefore, could only survive with respect to injunctive relief.

## III. No rational jury could find that the restrictions on movies and video games were implemented to retaliate against the detainees for pursuing lawsuits or filing grievances.

Plaintiffs contend that the movie and game restrictions were first put in place by Defendant Jumper's predecessor, Raymond Wood, and then continued by Defendant Jumper in retaliation for various lawsuits. Even if Defendants were motivated in part by retaliation, the retaliation claim cannot succeed because the restrictions are reasonably related to legitimate government interests. *See* <u>Lingle v. Kibby</u>, 2013 WL 1558545 (7th Cir. 2013)("We have observed, albeit in dicta, that the question whether a ban on

speech is rationally related to legitimate institutional goals is an objective inquiry; the subjective motives of those who implement the ban should not matter.")(*citing* <u>Hammer v. Ashcroft</u>, 570 F.3d 798, 802–03 (7th Cir.2009) (en banc). In any event, Plaintiffs present no evidence that Defendant Jumper's continuation of the restrictions, or revision of restrictions, was in retaliation for lawsuits.

IT IS THEREFORE ORDERED:

1. The motions for summary judgment by Defendants' Groot, et al. and Kibby, et al., are granted as to the claims arising from the restrictions on movies and video games (d/e's 165, 182). Said motions are denied as to the electronics policies (including the ban on video gaming systems) in order to give Plaintiffs an opportunity to conduct discovery on the supplemental information provided by Defendants in response to the Court's order. The Court will rule on the electronic device claims when the Court rules on the supplemental motions for summary judgment.

2. Plaintiffs' motion for discovery (d/e 209) is granted to the extent Plaintiffs ask for time to conduct discovery on the

supplemental information provided by Defendants in response to the Court's order.

3. Discovery is reopened on the electronic devices claims only, which includes the claim about the restrictions on video gaming systems. Discovery closes on this claim on May 31, 2014.

4. Plaintiff's supplemental response on the electronics claim is due June 30, 2014.

5. Defendants' motion for leave to file documents under seal is denied (d/e 207). Some of the purportedly confidential information in the manuals appears to already have been filed by Plaintiffs or already discussed in the affidavits provided by Defendants. Defendants' alternative request to strike the documents is granted.

6. Plaintiff's request to strike the testimony of Jason White and James Clayton is denied (d/e 211). To the extent the testimony of White or Clayton can be characterized as expert testimony, the failure to disclose the testimony or make expert disclosures is explained by the Court's order directing Defendants to provide the supplemental information.

Additionally, Plaintiffs will not be prejudiced by the admission of the testimony because Plaintiffs are being given an opportunity to conduct discovery on the conclusions of Jason White and James Clayton.

7. **The clerk is directed to docket # 204 as a supplemental motion for summary judgment by Defendants Kibby and Phillips.**

8. **The clerk is directed to strike the documents filed under seal (d/e 205).**

ENTER:    March 28, 2014

FOR THE COURT:


                                    **s/Sue E. Myerscough**
                                    SUE E. MYERSCOUGH
                                    UNITED STATES DISTRICT JUDGE